**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

Reginal Poulard

                         *Plaintiff,*

            -against-

Guy-max Delphin, Delphin Investments, LLC, and
Amitie Alternative Capital Partners, LLC

                        *Defendants.*

---------------------------------------------------------------------X

**Case No.**

**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

## PRELIMINARY STATEMENT

Plaintiff Reginal Poulard ("Mr. Poulard" or "Plaintiff"), by and through his undersigned counsel, Conway & Conway, brings this action for damages and other legal or equitable relief against Defendants Guy-max Delphin ("Mr. Delphin"), Delphin Investments, LLC ("Delphin Investments"), and Amitie Alternative Capital Partners, LLC ("AACP," or collectively "Defendants"), for (1) breach of contract and fraud related to Mr. Poulard's investment in AACP and (2) any other claim(s) that can be inferred from the facts set forth herein.

## JURISDICTION

1. Plaintiff Reginal Poulard is a Haitian citizen and a resident of the state of Florida. Mr. Poulard resides at 6703 Spring Garden Run, Lake Worth, FL 33463.

2. Defendant Guy-Max Delphin is a United States citizen and a resident of the state of New York. Mr. Delphin resides at 250 West 89th Street, Apt 7F, New York, NY 10024.

3. Defendant Delphin Investments is a domestic limited liability company with a principal office located at 250 West 89th Street, New York, NY 10024.

4. Defendant AACP is a domestic limited liability company with a principal office located at 46 Southfield Avenue, Suite 102, Stamford, CT 06902.

5. Pursuant to 28 U.S.C. § 1332(a) this Court has jurisdiction over this matter, as Plaintiff and Defendants are citizens of Florida, New York, and Connecticut respectively, and the amount in controversy is not less than two hundred ten thousand dollars ($210,000.00).

## STATEMENT OF FACTS

6. Mr. Poulard was born on November 28, 1979 in Haiti and is currently 43 years old.

7. Mr. Poulard immigrated to America in 2010.

8. Mr. Poulard obtained a Master's Degree in information systems management from the University of Liverpool in or about 2016.

9. For the past seventeen years, Mr. Poulard has been employed by the United Nations, working in property management. His current title is Chief of the Property Survey Board.

10. In or about January of 2015, Mr. Poulard was introduced to Mr. Delphin by a mutual acquaintance and fellow Haitian national, Jacques Armand ("Mr. Armand").

11. At the time, Mr. Delphin was an investment advisor registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. ("FINRA") (FINRA CRD Number 3083371). His registration terminated in 2018.

12. Mr. Armand had attended high school in Haiti with Mr. Delphin, and later reconnected with Mr. Delphin in the United States.

13. Upon reconnecting in the United States, Mr. Delphin represented to Mr. Armand that Mr. Delphin operated a profitable hedge fund – Delphin Investments, LLC, and presented an investment opportunity to Mr. Armand.

14. Delphin Investments LLC is, and was at the time, an investment advisory firm registered with the SEC in New York (CRD Number 149126).[1]

15. Mr. Delphin further encouraged Mr. Armand to market this investment opportunity to other potential investors.

16. In or about January of 2015, Mr. Armand informed Mr. Poulard of the investment opportunity, and connected him to Mr. Delphin via email and telephone.

17. Mr. Delphin informed Mr. Poulard of the same investment opportunity – by which Mr. Poulard would invest money in Delphin Investments.

18. Mr. Delphin explained that the money Mr. Poulard invested in Delphin investments would be used to purchase certain equities. Mr. Delphin stated that these equities would consist of shares in various pension funds and pharmaceutical companies.

19. The investment was actually in AACP, which in turn owned a 15.86% share in Delphin Investments. Mr. Delphin did not explain this distinction to Mr. Poulard.

20. Mr. Delphin advised that Mr. Poulard's returns would be determined by the performance of Delphin Investments.

---

[1] At the time, Delphin Investments was also registered in Connecticut. Its Connecticut registration has since been terminated.

21. However, Mr. Delphin guaranteed to Mr. Poulard that Mr. Poulard would receive a distribution each quarter for six (6) years, at which point Mr. Delphin would buy out Mr. Poulard's investment in AACP.

22. Mr. Delphin, in an email dated March 8, 2015, projected that, based on a $250,000.00 investment, Mr. Poulard would receive a total of $939,834.00 in distributions over the six year period, and that Mr. Delphin would buy out his investment for $614,524.00 in 2021. *See Exhibit 1, March 8, 2015 Email*.

23. Mr. Poulard expressed interest in the AACP investment, and at this point, Mr. Delphin began to call Mr. Poulard every day to urge him to invest with Mr. Delphin as soon as possible.

24. On February 4, 2015, Mr. Poulard executed a subscription agreement by which he would invest $250,000 in AACP. *See Exhibit 2, Subscription Agreement*.

25. The subscription agreement states in part "the Investor has a guaranteed exit strategy at a predetermined price" in reference to the buyout promised by Mr. Delphin.

26. It further states "the implied Internal Rate of Return (IRR) is expected to be approximately 18%[,]" and provides a cash-flow chart to support this projection.

27. While the subscription agreement further contained disclosure of certain risk factors, Mr. Delphin assured Mr. Poulard that his returns were guaranteed, and in fact, that the returns projected in the subscription agreement and via email by Mr. Delphin were the lowest possible returns Mr. Poulard could receive.

28. On April 21, 2015, Mr. Poulard made an initial payment of one hundred thousand dollars ($100,000.00) to Mr. Delphin via wire transfer.

4

29. Mr. Delphin maintained two separate bank accounts one at Bank of America in the name of Delphin Investments, and one at Wells Fargo in the name of AACP.

30. While Mr. Delphin had represented to Mr. Poulard that his investment was in AACP, he directed Mr. Poulard to wire his initial investment to the Delphin Investments Bank of America account. *See Exhibit 3, April 2015 Account Statement, at Page 3*.

31. Over the next several days after Mr. Delphin received Mr. Poulard's payment, nearly the entirety of the payment was transferred out of the Delphin Investments account and appears to have been used for Mr. Delphin's personal expenses, including a large American Express payment, a payment of legal bills, and certain transfers directly to Mr. Delphin. *See Exhibit 3, April 2015 Account Statement, at Page 4*.

32. On August 11, 2015, Mr. Poulard made a second payment via wire transfer to the Delphin Investments Bank of America account in the amount of fifty thousand dollars ($50,000.00). *See Exhibit 4, August 2015 Account Statement*.

33. Once again, Mr. Poulard's payment was transferred out of the account over the next several days, including a payment to "Heather C. Carmichael" in the amount of twenty thousand dollars ($20,000.00) and payment of Verizon Wireless bills.

34. On January 25, 2016, Mr. Poulard made a third payment via wire transfer to the Delphin Investments Bank of America account in the amount of twenty five thousand dollars ($25,000.00). *See Exhibit 5, January 2016 Account Statement*.

35. Again, much of Mr. Poulard's payment was transferred out of the account in the subsequent days, purportedly for Delphin Investments payroll.[2]

36. In addition to the above-enumerated payments, Mr. Poulard paid an additional thirty five thousand dollars ($35,000.00) to Mr. Delphin, for a total investment amount of two hundred ten thousand dollars ($210,000.00).

37. Notably, none of the money invested by Mr. Poulard was ever transferred to the AACP account at Wells Fargo, nor was it used to purchase the equities Mr. Delphin had represented it would be used to purchase.

38. Upon information and belief, Mr. Delphin instead converted Mr. Poulard's investment funds for his personal benefit.

39. Despite the promises made by Mr. Delphin, Mr. Poulard never received a distribution as a result of his investment in AACP.

40. Mr. Poulard frequently inquired to Mr. Delphin via Whatsapp as to when he could expect to begin receiving the promised distributions.

41. Mr. Delphin repeatedly promised that the distributions would be paid, and provided "quarterly business updates" that indicated the same.

42. This continued until 2019, at which point Mr. Poulard demanded that Mr. Delphin return his capital.

43. Mr. Delphin responded by blocking Mr. Poulard's phone number on Whatsapp, and threatening legal action for defamation against Mr. Poulard via email. *See Exhibit 6, Email dated November 1, 2019.*

---

[2] According to Delphin Investment's Form ADV filed with the SEC, Delphin Investments has just two employees, one of which is Mr. Delphin.

44. On September 22, 2021, at which point the "guaranteed buyout" provision of the subscription agreement was supposed to come into effect, Mr. Poulard informed Mr. Delphin via letter that he wanted to be bought out of his position in AACP. *See Exhibit 7, September 22, 2021 Letter*.

45. Despite the supposed guaranteed exit reflected in the subscription agreement, Mr. Delphin refused to buy out Mr. Poulard's position.

46. To date, Mr. Delphin has ceased responding to Mr. Poulard's communication and has not returned any of the funds invested by Mr. Poulard. Mr. Poulard has not received any distribution as a result of his investment in AACP.

47. As a result of Defendants' misconduct, Mr. Poulard has incurred losses in an amount not yet fully determined, but not less than two hundred ten thousand dollars ($210,000.00).

## COUNTS ALLEGED

### COUNT ONE:
### COMMON LAW FRAUD

48. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 47 as if fully set forth herein.

49. The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.[3]

50. "Where a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."[4]

---

[3] Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979, 883 N.Y.S.2d 147, 150, 12 N.Y.3d 553, 559 [NY, 2009].

7

51. Defendants willfully made various material misrepresentations concerning, among other things, that Plaintiff's investment funds would be used to purchase equities, that Plaintiff would have a guaranteed exit from his investment, and that Plaintiff would receive consistent distributions and a guaranteed return of at least 18% on his investment.

52. Defendants knew of the falsity of the misrepresentations when made, and yet made such misrepresentations with the intent of deceiving and defrauding Plaintiff and inducing Plaintiff to invest his funds with Defendants.

53. Plaintiff did in fact rely on Defendants' misrepresentations and invested his funds with Defendants.

54. Despite Defendants' representations, Plaintiff's investment funds were used to pay for Mr. Delphin's personal expenses, Plaintiff was unable to exit his investment, and Plaintiff never received any distribution or return on his investment.

55. As a result of Defendants' fraud, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of two hundred ten thousand dollars ($210,000.00).

## COUNT TWO:
## FRAUDULENT INDUCEMENT

56. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 55 as if fully set forth herein.

57. "The elements of a claim for fraudulent inducement are: 1) a false representation of material fact, 2) known by the utterer to be untrue, 3) with the intention of

---

[4] N.Y. CPLR § 3016 (McKinney 2018) ("Particularity in specific actions").

inducing reliance and forbearance from further inquiry, 4) that is justifiably relied upon, and 5) results in damages."[5]

58. Defendants falsely represented to Plaintiff that Plaintiff's investment funds would be used to purchase equities, that Plaintiff would have a guaranteed exit from his investment, and that Plaintiff would receive consistent distributions and and a guaranteed return of at least 18% on his investment.

59. Defendants knew this statement to be untrue, and intended to induce Plaintiff to invest his funds with Defendants.

60. Defendants did not at any point advise Plaintiff that Plaintiff's funds would be used to pay Mr. Delphin's personal expenses, that there was no guaranteed exit from Plaintiff's investment, or that Plaintiff's investment would generate no returns or distributions.

61. Plaintiff relied upon Defendants' representations in deciding to invest his funds with Defendants.

62. As a result of Defendants' fraudulent inducement, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of Two Hundred Ten Thousand Dollars ($210,000.00).

## COUNT THREE:
## FRAUDULENT CONCEALMENT

63. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

---

[5] MBIA Ins. Corp. v Credit Suisse Securities (USA) LLC, 927 N.Y.S.2d 517, 530, 32 Misc. 3d 758, 773, 2011 N.Y. Slip Op. 21191, (Sup Ct, June 01, 2011)

64. "[U]nder New York law, a fraudulent concealment claim must show that: "(1) the defendant failed to disclose material information that he had a duty to disclose, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of such reliance."[6]

65. Defendants, who solicited Plaintiff to invest his funds with Defendants, had an ongoing duty to provide accurate information in regard to the investment to Plaintiff.

66. Defendants, with the intent to defraud Plaintiff, represented to Plaintiff that Plaintiff's investment funds would be used to purchase equities, that Plaintiff would have a guaranteed exit from his investment, and that Plaintiff would receive consistent distributions and a guaranteed return of at least 18% on his investment.

67. Plaintiff reasonably relied on Defendants' representations in deciding to invest his funds with Defendants.

68. Defendants, despite their continuing obligation to provide accurate information to Plaintiff, never disclosed to Plaintiff that any of the above representations were untrue, and in fact, repeatedly promised that Plaintiff would begin to receive distributions, and provided misleading "quarterly updates" to Plaintiff to assure Plaintiff that his investment with Defendants was safe.

---

[6] Katen & Sons, Inc. v Allegheny Trucks, Inc., 316CV01124BKSDEP, 2018 WL 4689089, at *4 [NDNY Sept. 28, 2018]

69. As a result of Defendants' fraudulent concealment, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of Two Hundred Ten Thousand Dollars ($210,000.00).

## COUNT FOUR:
## BREACH OF CONTRACT

70. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 69 as if fully set forth herein.

71. The elements of a breach of contract claim are formation of a contract, performance by one party, failure to perform by another, and resulting damages.[7]

72. The parties entered into an agreement when Plaintiff executed a subscription agreement with Defendants under terms whereby Plaintiff agreed to purchase shares in AACP from Defendants.

73. Plaintiff has performed all conditions precedent to bringing this action for breach of contract.

74. Defendants have each breached their contractual relationship with Plaintiff in the following manner:

    a.    By negligently performing duties of supervision and due care with respect to Plaintiff's investment.

    b.    By breaching the fiduciary duty owed to Plaintiff by reason of the contractual relationship and the duties, laws, rules, and regulations thereby incorporated which govern the transactions between Plaintiff and Defendants.

    c.    By knowingly violating state and federal securities laws.

---

[7] New York State Workers' Compensation Bd. v. SGRisk, LLC, 983 N.Y.S.2d 642, 648, 116 A.D.3d 1148, 1153 [NY App. 3rd Dept., 2014].

75. As a result of Defendants' breach of contract, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of two hundred ten thousand dollars ($210,000.00).

## COUNT SIX:
## BREACH OF FIDUCIARY DUTY

76. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 75 as if fully set forth herein.

77. In order to establish a breach of fiduciary duty, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct."[8]

78. A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship."[9]

79. Defendants owe an affirmative duty of care and loyalty to their customers. That duty is heightened when the customers are unsophisticated.

80. Defendants knew or should have known that Plaintiff, an unsophisticated investor, placed his complete trust and confidence in Defendants to provide accurate information in regard to the investment Defendants solicited Plaintiff to make.

81. Defendants breached their fiduciary duty to Plaintiff under applicable state and federal securities laws and exchange rules in a reckless, willful, and wanton manner and with total disregard for the legal and fiduciary rights of Plaintiff, by

---

[8] Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dep't, 2007).
[9] EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 832 N.E.2d 26 [N.Y. 2011] (*citing* Restatement [Second] of Torts § 874, Comment *a*.).

fraudulently inducing Plaintiff to invest with Defendants and converting his funds.

82. As a result of Defendants' breach of fiduciary duty, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of two hundred ten thousand dollars ($210,000.00).

## COUNT SEVEN
## MISREPRESENTATIONS AND OMISSIONS

83. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 82 as if fully set forth herein.

84. A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."[10]

85. Defendants solicited Plaintiff to invest his funds with Defendants, and thus had a special duty to impart correct information to Plaintiff regarding his investment.

86. Defendants gave incorrect information to Plaintiff when Defendants represented to Plaintiff that Plaintiff's investment funds would be used to purchase equities, that Plaintiff would have a guaranteed exit from his investment, and that Plaintiff's investment would generate consistent distributions and a guaranteed return of at least 18% on his investment.

87. Plaintiff reasonably relied on this information in making his decisions to invest his money with Defendants and execute the Subscription Agreement.

---

[10]    J.A.O. Acquisition Corp. v. Stavitsky, 863 N.E.2d 585, 587, 831 N.Y.S.2d 364, 366, 8 N.Y.3d 144, 148 [NY 2007].

13

88. As a result of Defendants' misrepresentations and omissions, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of two hundred ten thousand dollars ($210,000.00).

## COUNT EIGHT:
## BREACH OF THE DUTY OF GOOD FAITH & FAIR DEALING

89. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

90. "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."[11]

91. As a result of his contract with Defendants, Plaintiff expected to obtain the benefit of his investment funds being used to purchase equities in order to generate a return for Plaintiff.

92. Defendants withheld a benefit from Plaintiff in failing to use his investment funds to purchase equities.

93. As a result of Defendants' breach of the duty of good faith and fair dealing, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of two hundred ten thousand dollars ($210,000.00).

## COUNT NINE:
## CONVERSION

94. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 93 as if fully set forth herein.

---

[11] Aventine Inv. Management, Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (2d Dep't, 1999).

14

95. "To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."[12]

96. Here the property subject to conversion is the money that Plaintiff invested with Defendants.

97. Plaintiff had ownership and control over his money before its conversion by Defendants.

98. Defendants exercised an unauthorized dominion over the money in its question, when Defendants solicited Plaintiff to invest his money with Defendants under the false pretense that Plaintiff's money would be used to purchase equities.

99. Defendants, rather than use Plaintiff's investment funds to purchase equities as promised, converted Plaintiff's investment funds and used them to pay Mr. Delphin's personal expenses.

100. As a result of Defendants' conversion, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of Two Hundred Ten Thousand Dollars ($210,000.00).

## COUNT TEN:
## UNJUST ENRICHMENT

101. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 100 as if fully set forth herein.

---

[12] Neely v. Residential Mortg. Solution, LLC, 2015 WL 6438772, at *4 (E.D.N.Y. 2015).

102. An unjust enrichment claim requires that the plaintiff shows "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."[13]

103. The essence of an unjust enrichment claim is "an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it."[14]

104. Defendants were enriched by retaining Plaintiff's investment funds after failing to purchase equities with said funds as promised to Plaintiff.

105. Defendants were enriched at Plaintiff's expense because as a result Defendants' failure to invest Plaintiff's funds as promised, Plaintiff was deprived of the funds and the opportunity to generate a return on said funds.

106. It is against equity and good conscience to permit Defendants to retain Plaintiff's investment funds because Defendants had an obligation to invest the funds as promised to Plaintiff.

107. As a result of Defendants' unjust enrichment, Plaintiff has been damaged in an amount not yet fully ascertained, but believed to be in excess of Two Hundred Ten Thousand Dollars ($210,000.00).

**WHEREFORE** Plaintiff requests the following relief:

---

[13] Mandarin Trading v. Wildenstein, 16 N.Y.3d 173 (N.Y. 2011), at 182.
[14] Saunders v. Klein, 55 A.D.2d 887 (1st Dep't, 1977), at 888.

a. On the First Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

b. On the Second Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

c. On the Third Count awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

d. On the Fourth Count awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

e. On the Fifth Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

f. On the Sixth Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

g. On the Seventh Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

h.  On the Eighth Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

i.  On the Ninth Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

j.  On the Tenth Count, awarding compensatory damages in an amount to be determined at trial but not less than Two Hundred Ten Thousand Dollars ($210,000.00).

k.  As to all Counts, awarding interest accruing from the date of the breach, which Plaintiff alleges to be no later than the date on which Mr. Poulard executed the subscription agreement, February 4, 2015.

l.  As to all Counts, awarding Plaintiff's compensatory damages totaling an amount in excess of Two Hundred Ten Thousand Dollars ($210,000.00) plus interest, costs, reasonable attorneys' fees, and punitive damages.

m.  As to all Counts, awarding such other and further relief as this Court deems just and fair.

Dated: New York, New York
January 31, 2023

Respectfully submitted

CONWAY & CONWAY
Kevin P. Conway (6946)
Attorney for Plaintiff
99 Park Avenue, 6th Floor
New York, New York 10016
Tel: (212) 938-1080
Fax (212) 938-1207