UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGINAL POULARD,

              Plaintiff,

      – against –

GUY-MAX DELPHIN, DELPHIN
INVESTMENTS, LLC, *and* AMITIE
ALTERNATIVE CAPITAL PARTNERS,
LLC,

              Defendants.

**OPINION & ORDER**

23-cv-791 (ER)

RAMOS, D.J.:

       Reginal Poulard brought this action against Guy-Max Delphin and his companies, Delphin Investments, LLC ("Delphin Investments") and Amitie Alternative Capital Partners, LLC ("AACP"), (collectively, "Defendants") arising from an allegedly fraudulent investment that Delphin induced Poulard to make in his companies. Doc. 1. Before the Court is Defendants' motion to dismiss the action in its entirety. Doc. 27. For the reasons set forth below, the motion is GRANTED.

## I.    BACKGROUND

### A.  Factual Background

       Poulard is a 44-year-old Haitian national and U.S. citizen who immigrated to the United States in 2010. Doc. 19 (Am. Compl.) ¶¶ 1, 13–14. Delphin is a Haitian national and U.S. citizen who went to high school with Poulard in Haiti and later reconnected with Poulard in the United States in January 2015 after being re-introduced by a mutual friend and fellow Haitian national, Jacques Armand. *Id.* ¶¶ 2, 17, 19.

       At the time, Delphin was an investment advisor registered with the Securities and Exchange Commission ("the SEC") and the Financial Industry Regulation Authority

("FINRA").[1]  *Id.* ¶ 18.  When Delphin and Armand reconnected, Delphin told Armand that he operated a profitable hedge fund, Delphin Investments,[2] and presented Armand an opportunity to invest in it.  *Id.* ¶ 20.  Delphin also encouraged Armand to market the investment opportunity to others.  *Id.* ¶ 22.  Accordingly, in January 2015, Armand informed Poulard of the investment opportunity, and connected Armand to Delphin by email and phone.  *Id.* ¶ 23.

Delphin told Poulard of the opportunity to invest in Delphin Investments, representing that the money Poulard invested would be used to purchase equities in various pension funds and pharmaceutical companies.  *Id.* ¶¶ 24–25.  In fact, however, Poulard would actually be investing money in AACP, which owned a 15.86% share in Delphin Investments; but Delphin did not explain this distinction to Poulard.  *Id.* ¶ 26. Although Delphin told Poulard that his returns would be determined by Delphin Investments' performance, Delphin also guaranteed to Poulard that he would receive a distribution each quarter for six years, at which point Delphin would buy out Poulard's investment.  *Id.* ¶¶ 27–28.  Poulard expressed interest in the investment, and Delphin began calling him daily to urge him to invest as soon as possible.  *Id.* ¶ 30.

On February 4, 2015, Poulard executed a subscription and adoption agreement to invest $250,000 in AACP as part of a $3,000,000 equity financing of AACP ("the Agreement").  *Id.* ¶ 31; *see also* Doc. 19-2 (Agreement).[3]  In exchange, he would receive 0.375% of Class B (non-voting) shares of AACP, which would "participate in Delphin Investments' net operating profit (in the year following positive operating profit, estimated 2015) in proportion commensurate with capital committed by the partners at

---

[1] The complaint alleges that Delphin's "registration terminated in 2018" but does not specify whether that was as to the SEC or FINRA registration, or both, nor the reason for the termination of the registration.  *Id.* ¶ 18.

[2] Delphin Investments was, and still is, an investment advisory firm registered with the SEC in New York. *Id.* ¶ 21.

[3] The copy of the Agreement that Poulard attached as an exhibit to the complaint is signed by him but not countersigned by Delphin, Delphin Investments, or AACP.  *See* Doc. 19-2.

the close of fundraising."  Doc. 19-2 at 1.  Proceeds from the subscription would be "used for (1) working capital of the business, (2) build strategic partnerships and/or (3) added to the existing strategies, continuing to build the [assets under management] and track record of each product."  *Id.* at 2.  The Agreement further provided that Poulard would have "a guaranteed exit strategy at a predetermined price" (*i.e.*, the buyout), that the "implied Internal Rate of Return (IRR) [wa]s expected to be approximately 18%" (with a cash flow projection supporting that projection), and that Poulard authorized AACP to appoint Delphin Investments as an investment manager with exclusive responsibility to manage the investments.  *Id.* at 1, 8–9.  The Agreement is governed by Connecticut law. *Id.* at 2.

While the Agreement contained disclosures of certain risk factors, including loss of the principal (*id.*), Delphin separately assured Poulard that his returns were guaranteed (Doc. 19 ¶ 35).  Indeed, on March 8, 2015, Delphin emailed Poulard and Armand that a $250,000 investment would result in the investor receiving a total of $939,834 in distributions over the six years, including Delphin's buyout for $614,524 in 2021.  *Id.* ¶ 29; *see also* Doc. 19-1 (Mar. 8, 2015 Email).  And Delphin promised that those returns were "the lowest possible returns" Poulard could receive.  *Id.* ¶ 35.

On April 21, 2015, Poulard wired Delphin $100,000 as an initial payment.  *Id.* ¶ 36.  Contrary to the Agreement, however, the money was sent to Delphin Investments' bank account at Bank of America, rather than AACP's account at Wells Fargo.  *Id.* ¶¶ 37–38; *see also* Doc. 19-3 (Delphin Investments April 2015 Bank Statement) at 3.  And, over the next several days, unbeknownst to Poulard, nearly the entirety of the payment was transferred out of Delphin Investments' account for what Poulard alleges were Delphin's personal expenses.  Doc. 19 ¶ 39; Doc. 19-3 at 4.  On August 11, 2015, Poulard wired a second payment of $50,000 to Delphin Investments' account, and, again, the payment was transferred out of the account over several days for allegedly personal expenses. Doc. 19 ¶¶ 40–41; Doc. 19-4 (Delphin Investments Aug. 2015 Bank Statement) at 3–4.

The same thing happened again after Poulard wired a third payment of $25,000 on January 25, 2016.  Doc. 19 ¶¶ 42–43; Doc. 19-5 (Delphin Investments Jan. 2016 Bank Statement) at 3–5.  In addition to those three payments, Poulard also wired Delphin an additional $35,000, bringing his total investment to $210,000.  Doc. 19 ¶ 44.

Poulard alleges that none of the money he invested was ever transferred to AACP, nor ever used to purchase the equities that Delphin had represented he would purchase; rather it was all used for Delphin's personal benefit.  *Id.* ¶¶ 45–46.  Moreover, Poulard has never received any distributions from his investment.  *Id.* ¶ 47.  Poulard frequently asked Delphin when the distributions would be paid and, at first, Delphin repeatedly promised they would be paid.[4]  *Id.* ¶¶ 48–49.

On October 16, 2018, Armand began to email Delphin about returning the money to Poulard (although Poulard was not copied on that initial email).[5]  Doc. 19-6 (Email Thread of 25 Emails Between Armand, Delphin, and Poulard from Oct. 16, 2018 to Nov. 9, 2020) at 21.  The same day Delphin responded, emphasizing that Poulard "did not invest in any of our hedge fund[s] or traditional products managed at Delphin Investments (Investment Management firm)" but had instead "made an equity investment (profit sharing) into the investment management firm (DI) via [AACP]."  *Id* at 19.  Delphin also noted:

> While this is not what an investor wants to hear, not until we have strong free cash flows, we would not attempt buying out any investors.  But I've added [Poulard] to the list [of investors seeking to be bought out] for when that possibility arises.  This may not be for years to come and only if we are able to turn the business around.  Otherwise, the investment in [sic] valued at $0.

*Id.* at 20–21.

---

[4] Poulard does not state when these representations of forthcoming payments were made.

[5] Poulard was not added to the email thread until November 1, 2019, but it appears he was able to see the prior messages thereafter.  The Court notes, moreover, that Poulard does not explain why Armand was emailing Delphin to complain about the fact that *Poulard* was not being paid on his investment.

One year later, on October 24, 2019, Armand again emailed Delphin and questioned if he and Poulard had been "duped" and stated that they "may have been subject to:  fraud, deceit[,] and misrepresentation of facts."  *Id.* at 18.  Responding the same day, Delphin continued to reiterate that, pursuant to the Agreement, Armand and Poulard had invested only in the company, not the fund, and would therefore only participate in Delphin Investments' net operating profits in the year following a positive operating profit (which was originally estimated to be 2015, but not guaranteed), but it had not been profitable thus far, so no distributions were due.  *Id.* at 14–15.  Armand responded the same day that this was all a "premeditated dishonest scheme," by which Delphin would not return any invested capital and instead "hid[e] behind the language of a document."  *Id.* at 14.  Minutes later, Delphin responded that they had lost their biggest client, who represented 90% of the revenue, since Poulard and Armand had invested, but "[a]s long as the company exists[,] your ownership in the company remains and capital will be distributed when and if profitable and according to what was signed."  *Id.* at 13.

Copying Poulard on the email thread for the first time, on November 1, 2019, Armand requested a copy of the past five years' financial statements.  *Id.* at 11–12.  The same day, Delphin attached tax returns from 2014 to 2018,[6] alleged that Armand's prior comment about a "premeditated dishonest scheme" was defamatory, that he and Armand should only talk through lawyers from now on, and reiterated that "for your buyout, you have to adhere to what is in the document and signed."  *Id.* at 10.  He also blocked Poulard's phone number to prevent Poulard from asking for his money back.  Doc. 19 ¶ 51.

On January 4, 2020, Armand (still with Poulard copied) again reiterated that Poulard needed to have his investment returned.  Doc. 19-6 at 4.  The same day, Delphin replied to the email chain:  "It will get done."  *Id.*  One month later, on February 1, 2020,

---

[6] Although the tax returns were purportedly attached to Delphin's November 1, 2019 email, they were not attached to the emails submitted as an exhibit to the complaint.  *See* Doc. 19-6.

Armand again emailed Delphin, copying Poulard, to ask that Delphin return Poulard's investment. *Id.* The same day, Delphin replied: "Allow[] us additional time as we are working on it." *Id.* at 3. Armand again emailed Delphin and Poulard on February 22, 2020 to ask for an update regarding Poulard's money. *Id.* Four days later, on February 26, 2020, Delphin emailed back that Delphin Investments was "working on a new contract" that might impact the company's cash flows. *Id.* at 2–3.

On November 8, 2020, weighing in on the email chain for the first time, Poulard emailed Delphin and Armand: "You guys convinced me to join this mess. . . . I have not seen any bloody cash distribution for the past 5 years. Can you guys tell me what is going on? When will I ever see the cash distribution that [Delphin] has been talking about?" *Id.* at 2. The next day, Delphin emailed back that it had "been challenging times for all of us," but he was "still trying to find a way as we are still not profitable," and the Agreement's conditions to distributions were therefore not met, but he anticipated that Delphin Investments would be in better financial condition in 2021, "[b]ased on all activities in our pipeline currently." *Id.* at 1. Delphin also noted, however, that he was still working on finding an investor to buy Poulard out of his ownership in the company. *Id.*

Ten months later, on September 22, 2021, after the "guaranteed buyout" provision should have come into effect, Poulard informed Delphin that he wished to be bought out of his position in AACP by November 30, 2021. Doc. 19 ¶ 52; Doc. 19-7 (Sept. 22, 2021 Letter). Delphin refused. Doc. 19 ¶ 53. Since then, Delphin has ceased responding to Poulard's communications and has not paid Poulard either his principal investment or any returns. *Id.* ¶ 55.

In January 2022, Poulard retained counsel to attempt to secure a return of his funds from Delphin. *Id.* ¶ 56. At the request of Poulard's counsel, Delphin provided documents relating to Poulard's investment, including bank statements for the Delphin Investments account, revealing for the first time how Delphin had actually spent

Poulard's funds.  *Id.* ¶¶57–59.  The bank statements show, among other withdrawals and debits, transfers of funds to other accounts; payroll; and payments to Verizon Wireless, American Express, Aetna and CityMD, grocery stores and restaurants, a wine store, a life insurance provider, cable bills, research services, and an office rental agency.  *See* Docs. 19-3–19-5.  Poulard alleges that these withdrawals and debits were for Delphin's personal use and not for business purposes.  Doc. 19 ¶¶ 39, 41, 59.

### B.  Procedural History

Poulard filed the instant suit against Delphin, Delphin Investments, and AACP on January 31, 2023 (Doc. 1) and amended his complaint on April 26, 2023 (Doc. 19). Poulard brings claims for common law fraud, fraudulent inducement, fraudulent concealment, breach of contract, breach of fiduciary duty, misrepresentations and omission, breach of the duty of good faith and fair dealing, conversion, and unjust enrichment.  Doc. 19 ¶¶ 62–121.  The instant motion to dismiss followed on May 2, 2023.[7]  Doc. 20.

## II.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator*

---

[7] When Defendants first filed their motion to dismiss, they failed to attach a memorandum of law in support.  *See* Doc. 20.  The Court permitted Defendants to refile the motion with a memorandum (Doc. 24), which Defendants then did (Doc. 27).

*Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

In considering a Rule 12(b)(6) motion, a district court may consider the complaint, exhibits thereto, and any document incorporated by reference or integral to it. *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)). Courts most commonly recognize documents as incorporated by reference or integral where "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Glob. Network Communs., Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006). Accordingly, when considering a motion to dismiss breach of contract claims, courts will look "at the contract itself, which by definition is integral to the complaint." *Sobel v. Major Energy Servs., LLC*, No. 19-cv-8290 (GBD), 2020 U.S. Dist. LEXIS

137832, at *13 (S.D.N.Y. July 31, 2020).  "If a document integral to the complaint contradicts that complaint, the document controls, and the court need not accept the complaint's allegations as true."  *Trustpilot Damages LLC v. Trustpilot, Inc.*, No. 21-cv-432 (JSR), 2021 U.S. Dist. LEXIS 121150, at *9 (S.D.N.Y. June 29, 2021) (citations omitted).

## III.   DISCUSSION

### A.  Poulard's Claims are All Barred by the Relevant Statutes of Limitations

Defendants allege that all nine of Poulard's causes of action are untimely.  Doc. 28 at 16–25.  Poulard responds that Counts 1, 2, and 3 are within the relevant discovery period for fraud claims, and Defendants are equitably estopped from raising any statutes of limitations defenses as to the remaining six claims.  Doc. 29 at 12–17, 22–23.

> *1.  Counts 1 (Common Law Fraud), 2 (Fraudulent Inducement), and 3 (Fraudulent Concealment) are Time-Barred*

The parties agree that Counts 1 through 3, which all sound in fraud, are governed by C.P.L.R. § 213(8).[8]  Doc. 28 at 16; Doc. 29 at 12.  Pursuant to N.Y. C.P.L.R. § 213(8), the time within which actions based upon fraud must be commenced "shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."  Defendants argue that, at the latest, the causes of action accrued in early 2015 when Delphin made the alleged misrepresentations, and the discovery period started on November 1, 2019 when he rebuffed Poulard's demands to return the money and blocked Poulard's number; accordingly, because the complaint was not filed until January 31, 2023, the claims are time-barred based on either the six-year accrual period or two-year

---

[8] Defendants' motion to dismiss, "like the amended complaint, assumes that the laws of New York apply" but states that "we cannot even be sure which jurisdiction's substantive laws apply" and suggests that it may be Florida's.  Doc. 28 at 12 n.6; *see also id.* at 19 n.11 ("While paragraph 10 of the [Agreement] provides that Connecticut law applies, . . . [f]or purposes of this motion, [Defendants] do[] not object to Poulard's desire [to] have the Agreement interpreted according to New York law.").

As the parties make arguments only under New York, and not Connecticut or Florida, law, the Court will decide the motion to dismiss on the basis of New York law.

discovery period.  Doc. 28 at 16–18.  Poulard, however, argues that he timely brought the claims within the two-year discovery period because he had no reason to suspect that Defendants had not invested in the equities Delphin had promised until Poulard obtained the bank account statements in January 2022 that revealed how his money had actually been spent.  Doc. 29 at 12–16.  He argues that the failure to pay distributions since 2015 and refusal to return funds in 2019 were insufficient to put him on notice of the fraud that is the gravamen of his claims—that Defendants did not spend his funds in the manner they had represented—given that Delphin continued to assure him the payments were forthcoming and the sole reason for the delay was because the funds were presently performing poorly.  *Id.* at 13.  In the alternative, Poulard argues that Defendants' concealment of the ongoing fraud tolled the statute of limitations.  *Id.* at 14–16.

Because Poulard makes no argument that the causes of action were by being brought within six years of accrual, the argument is deemed conceded, and the Court need not consider it.  *See McGriff v. Keyser*, No. 17-cv-7307 (NSR), 2019 WL 6033421, at *12 n.9 (S.D.N.Y. Nov. 13, 2019) ("It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims."); *see also Altowaiti v. Wolf*, No. 18-cv-508 (ER), 2021 U.S. Dist. LEXIS 130334, at *11–12 (S.D.N.Y. July 12, 2021) ("Indeed, numerous courts in this District have held that a plaintiff's failure to address an issue in an opposition to a Rule 12(b)(6) motion 'amounts to a concession or waiver of the argument.'" (quoting *Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16-cv-7014 (VSB), 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) (collecting cases))).  Thus, Poulard's claims will only be timely if brought within two years of when he discovered the fraud or "could with reasonable diligence have discovered it."  *See* C.P.L.R. § 213(8).  Put differently, since the complaint was filed on January 31, 2023 (Doc. 1), the claims will be untimely if the alleged fraud was discoverable with reasonable diligence before January 31, 2021.

"The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was possessed of knowledge of facts from which [the fraud] could be reasonably inferred." *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (citation omitted) (alteration in original).  Ordinarily, mere suspicion of fraud is insufficient to start the two-year clock. *See Koch v. Christie's Int'l Pub. Ltd. Co.*, 699 F.3d 141, 155 (2d Cir. 2012) ("Generally, knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute." (citation omitted)). But actual notice is not the only means of triggering the two-year period; inquiry notice will also start the clock.  Thus, "[w]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007) (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)); *see also Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 258 (S.D.N.Y. 2005) ("For the purpose of determining when the statute of limitations begins to run, the absence of conclusive evidence of *actual* knowledge is only the beginning of the inquiry, since the statutory period does not await 'the leisurely discovery of the full details of the alleged scheme.'" (emphasis in original) (quoting *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970))).  The duty to inquire is "triggered by information that relates directly to the misrepresentations and omissions" that form the basis of the plaintiff's suit, though the "triggering information need not detail every aspect of the [subsequently] alleged fraudulent scheme." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) (alteration in original) (internal quotation marks and citations omitted).  Moreover, the date on which

knowledge of a fraud is imputed to the plaintiff turns on the plaintiff's investigative efforts:

> If the plaintiff makes no inquiry once the duty to inquire arises, knowledge will be imputed as of the date the duty arose. And if some inquiry is made, [the court] will impute knowledge of what [a plaintiff] in the exercise of reasonable diligence[] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.

*Id.* at 361–62 (alteration in original) (internal quotation marks and citations omitted). The question is thus, not whether the plaintiff *could* have discovered the fraud earlier, but whether he had "reason to suspect" he had been defrauded (*i.e.*, had inquiry notice) and, once he did, whether he investigated it. *See Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 462 (S.D.N.Y. 2015).

Because notice is a mixed question of fact and law, it is not always readily judiciable upon a motion to dismiss. Where there is a factual dispute as to whether and when the plaintiff "was possessed of knowledge of facts from which [the fraud] could be reasonably inferred," the case should not be dismissed as untimely at the pleading stage. *Koch*, 699 F.3d at 155; *accord Lavin v. Kaufman, Greenhut, Lebowitz & Forman*, 226 A.D.2d 107, 109 (N.Y. App. Div. 1st Dep't 1996). But where there is no factual dispute about what knowledge the plaintiff had, and the question is only whether he could reasonably have inferred the fraud from that knowledge, dismissal for untimeliness *can* be appropriate. *See Koch*, 699 F.3d at 155 (affirming district court's dismissal of plaintiff's claims as untimely on a 12(b)(6) motion); *see also Cohen*, 711 F.3d at 362 ("[W]e have found dismissal appropriate [w]here . . . the facts needed for determination of when a reasonable [plaintiff] of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint." (alteration in original) (quoting *LC Capital Partners, L.P. v. Frontier Ins. Grp.*, 318 F.3d 148, 154 (2d Cir. 2003)) (internal quotation marks omitted)).

Here, Poulard bases his fraud claims on three primary misrepresentations:  "that [his] investment funds would be used to purchase equities, that [he] would have a guaranteed exit from his investment, and that [he] would receive consistent distributions and a guaranteed return of at least 18% on his investment."  Doc. 19 ¶ 65; *see also id.* ¶¶ 72, 80.  Poulard argues that the claims are timely because he "had no reason to suspect that Defendants had not invested [his] funds in equities as Defendants represented they would, [sic] until [Poulard] obtained certain bank account statements . . . from Defendants in January of 2022 which revealed how Defendants had spent [his] investment funds."  Doc. 29 at 12–13.

But this argument misses the mark in several respects.  First, the Agreement itself provides that Poulard was participating in the equity financing of AACP, not investing in Delphin Investments, and it delineates the uses of Poulard's funds, none of which include investment in equities—meaning that Poulard knew as early as February 4, 2015 that his money was not going to be a part of Delphin Investments' equity portfolio.  *See* Doc. 19-2 at 2 ("The proceeds from this equity transaction [financing AACP] will be used for (1) working capital of the business, (2) build strategic partnerships and/or (3) added to the existing strategies, continuing to build the [assets under management] and track record of each product.").  As to the other alleged misrepresentations regarding the distributions and buyout, although the January 2022 receipt of the bank statements may have been the first *actual* notice Poulard received of the fraud, it does not absolve him of the earlier *inquiry* notice.  The first of the promised distributions—*i.e.*, the first missed payment— was expected in 2015.  Doc. 19-2 at 1; Doc. 19-6 at 14–15.  Armand first inquired about the missing distributions and possible buyout on October 16, 2018, and, as early as October 24, 2019, Armand began asking if Delphin had "duped" them or committed "fraud" and "deceit."  Doc. 19-6 at 18–21.  And although Armand did not copy Poulard on that email chain at first, Poulard joined the chain one week afterwards on November 1, 2019, at which point he became aware of Armand's suspicions from the last year and also

received Delphin's response to Armand's allegations that Defendants participated in a "premeditated dishonest scheme." *Id.* at 10–12.  Around this same time, Poulard also alleges that Delphin blocked his phone number to prevent Poulard from asking for his money back.  Doc. 19 ¶ 51.  But at no point does Poulard allege that he did anything to investigate the status of his investment or Armand's concerns that Defendants had perpetrated a dishonest scheme.  In fact, even if Poulard never saw any of Armand and Delphin's emails when they were sent, he at the very least expressed his *own* suspicion when he emailed the chain on November 8, 2020.  Doc. 19-6 at 2 ("I have not seen any bloody cash distribution for the past 5 years.  Can you guys tell me what is going on? When will I ever see the cash distribution that [Delphin] has been talking about?").  Even after this, however, Poulard does not allege that he took any investigatory action until January 2022, well over a year later.  *See* Doc. 19 ¶ 56.  That Armand began inquiring about a possible fraud in October 2019 certainly insinuates that the circumstances were "such as to suggest to a person of ordinary intelligence the probability that he had been defrauded" and that Poulard's duty of inquiry was thus triggered.  *See Guilbert*, 480 F.3d at 147; *accord Cohen*, 711 F.3d at 361.  But even if the Court were to disregard Armand's doubts as somehow exceptional, Poulard's duty to inquire was unquestionably triggered at the very least when *Poulard himself* expressed his "reason to suspect" the fraud.  *See Martin Hilti Family*, 137 F. Supp. 3d at 462.  But Poulard still did not inquire. Consequently, "knowledge will be imputed as of the date the duty [to inquire] arose," *Cohen*, 711 F.3d at 361—here, November 8, 2020 at the latest (Doc. 19-6 at 2). Consequently, the two-year discovery period ended on November 8, 2022, and Poulard's January 31, 2023 claims are untimely.  And, as all of the facts concerning the duty of inquiry "can be gleaned from the complaint and papers . . . integral to the complaint," dismissal is appropriate.  *See Cohen*, 711 F.3d at 362.

In the alternative, Poulard alleges that the claims are not untimely because Defendants' "[f]raudulent concealment of the existence of a cause of action tolls the

running of the statute of limitations . . . [for] so long as the fraud is effective." Doc. 29 at 14 (quoting *Dos Santos v. Assurant, Inc.*, 625 F. Supp. 3d 121, 133 (S.D.N.Y. 2022)). But Poulard has cited no authority for the proposition that such tolling is available for the claims at issue here—which provide an entirely separate limitations period that specifically anticipates delayed discovery due to fraud—because the lone case Poulard cites in support of this proposition, *Dos Santos*, contains no fraud claims. Moreover, tolling based on fraudulent concealment is only available where the plaintiff proves "(1) wrongful concealment by [defendant], (2) which prevented [plaintiff's] discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim." *Dos Santos*, 625 F. Supp. 3d at 133 (alteration in original) (citation omitted). And, as noted above, the face of the complaint demonstrates that Poulard was not diligent in pursuing the discovery of his claims. Tolling is therefore inappropriate.

2. *Counts 4 (Breach of Contract), 6 (Breach of Fiduciary Duty), 7 (Negligent Misrepresentations), 8 (Breach of the Duty of Good Faith and Fair Dealing), 9 (Conversion), and 10 (Unjust Enrichment) are Also Time-Barred*[9]

Poulard's remaining contract and tort claims fare no better. The parties agree that each are governed by either the same six-year statute of limitations as his fraud claims (with the identical two-year discovery period), or an even shorter three-year period, that began running in either 2015 when Delphin told Poulard of the investments or, at the latest, early 2016 after Poulard wired the last tranche of his $210,000 investment. Doc. 28 at 18–25; Doc. 29 at 16–17, 19. Poulard additionally argues that Defendants are equitably estopped from raising a statute of limitations defense because "Defendants' continuous fraudulent misrepresentations caused [Poulard's] delay in the discovery of his claims, as detailed above." Doc. 29 at 22–23 (citing *Myers Indus. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 118 (S.D.N.Y. 2016); *Putter v. North Shore Univ. Hosp.*, 7

---

[9] The complaint has no fifth count. *See* Doc. 19.

N.Y.3d 548, 552–53 (N.Y. 2006)).  For the same reasons as stated above with respect to Counts 1, 2, and 3, Poulard's claims were not timely filed within three- or six-years from accrual, nor within two years of discovery.  Accordingly, Counts 4 and 6–10 will be timely only if Defendants are equitably estopped from raising a statute of limitations defense.

"Under the doctrine of equitable estoppel, . . . New York law will deny a defendant the benefit of a statute of limitations defense where the defendant's affirmative wrongdoing produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Myers Indus.*, 171 F. Supp. 3d at 118 (citing *Putter*, 7 N.Y.3d at 552).  Thus, "[e]quitable estoppel applies in cases where, for example, the defendant lulls the plaintiff into not filing suit with assurances that she will settle the case." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014).  "To invoke equitable estoppel, a plaintiff must show that:  (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Id.* (internal quotation marks and citation omitted).  But "[e]quitable estoppel will not toll a limitations statute . . . where a plaintiff possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations." *Koral*, 36 F.4th at 411 (alteration in original) (citation omitted).  If the plaintiff was placed on inquiry notice and had the opportunity to timely investigate but failed to do so, equitable estoppel is not available to him.  *See id.* Indeed, that failure to timely investigate was fatal to the plaintiffs' abilities to use equitable estoppel in both cases Poulard cited.  *See Myers Indus.*, 171 D. Supp. 3d at 119; *Putter*, 7 N.Y.3d at 553–54.

As the Court already held above, Poulard has not pled facts to show that he was diligent in investigating Defendants' wrongdoing once he was put on inquiry notice.  Consequently, he cannot invoke the protections of equitable estoppel.  *See Koral*, 36 F.4th

16

at 411.  His claims are therefore untimely, and the Court will grant Defendants' motion to dismiss.

### B.  Counts 1, 2, 3, 4, 9, and 10 Also Fail to State a Claim Upon Which Relief Can Be Granted

Defendants further argue that Poulard failed to plead his fraud claims (Counts 1, 2, and 3) with specificity, and Counts 4, 7, 8, 9, and 10 fail to state a claim upon which relief can be granted.[10]  Doc. 28 at 10–16, 18–24.

The Court agrees that Poulard failed to plead his fraud claims with particularity, as required by Federal Rule of Civil Procedure 9(b), and those claims must therefore be dismissed.  *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("[The Second Circuit] has read Rule 9(b) to require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (internal quotation marks and citation omitted)).

Count 4 alleges that Defendants breached the Agreement by (1) "negligently performing duties of supervision and due care with respect to [Poulard's] investment," (2) "breaching the fiduciary duty owed to [Poulard,]" and (3) "knowingly violating state and federal securities laws."  Doc. 19 ¶ 88.  In opposition, Poulard further argues that the relevant breach of contract is based on the Agreement's requirement that Poulard's investment funds be used to purchase equities, but Defendants failed to use the funds accordingly.  Doc. 29 at 16.  Poulard's breach of contract claim is thus insufficiently pled for several reasons.  First, Poulard does not allege how the three alleged breaches stated in the complaint breached any contractual clauses of the Agreement (as opposed to being separate bases for negligence, breach of fiduciary duty, or securities claims).  *See* Doc. 19 ¶ 88.  Second, the Agreement, which Poulard attached to his complaint, does not require

---

[10] Defendants do not make a 12(b)(6) argument with respect to Count 6, relying exclusively on a statute of limitations defense.  Doc. 28 at 19–20.

that his investment funds be used to purchase equities.  *See* Doc. 19-2.  But, third, even if it did so provide, Poulard may not amend his complaint through his opposition to the motion to dismiss.  *See Calltrol Corp. v. Loxysoft AB*, No. 18-cv-9026 (NSR), 2021 U.S. Dist. LEXIS 241125, at *4 n.2 (S.D.N.Y. Dec. 16, 2021) ("Plaintiff cannot amend its complaint or raise new claims in its opposition to a motion to dismiss." (citations omitted)).

Defendants also seek to dismiss Counts 4 and 8 (breach of contract and breach of duty of good faith and fair dealing, respectively) as against Delphin and Delphin Investments as non-parties to the Agreement, which was between Poulard and AACP. Doc. 28 at 18–19, 22.  Poulard argues that Delphin Investments and AACP are alter egos of Delphin.  Doc. 29 at 20 (quoting Doc. 19 ¶ 5).  On reply, Defendants do not address Poulard's alter ego allegations.  *See* Doc. 31.  The argument is therefore deemed abandoned.  *See Galin v. Hamada*, No. 15-cv-6992 (JMF), 2016 U.S. Dist. LEXIS 62071, at *7–8 (S.D.N.Y. May 10, 2016) ("Defendant did not renew those arguments in his reply after Plaintiff responded to them, so the Court deems them abandoned." (internal citations omitted)).

Count 7 raises a claim for negligent misrepresentation, which Defendants argue is deficient because (1) Poulard pleads no "special or privity-like relationship" between the parties, a necessary element of the claim, and (2) Poulard could not have reasonably relied on any incorrect oral statements made by Delphin because the Agreement contains an integration clause.  Doc. 28 at 20–21.  Both are highly fact-specific inquiries not generally susceptible to resolution on a motion to dismiss.  *See Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 355 (S.D.N.Y. 2017); *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 416 (S.D.N.Y. 2010).  But the Court need not decide either issue, since it has already held that the claim is time-barred.

Defendants further allege that Count 9 must be dismissed because Poulard has not alleged tortious acts beyond a mere breach of contract, as required to state a claim for

conversion.  Doc. 28 at 23–24.  Poulard responds that Defendants' misappropriation of Poulard's investment funds for personal benefit is sufficient, but he cites no authority for that proposition.  Doc. 29 at 21.  Because Poulard cites no law substantiating that Defendants' misappropriation is sufficient to state a claim for conversion, as opposed to merely breach of contract, the Court will dismiss the claim.  *See Gonzalez v. Comm'r of Soc. Sec.*, No. 21-cv-800 (JCM) (VB), 2022 U.S. Dist. LEXIS 98108, at *51 (S.D.N.Y. May 27, 2022) ("Courts have deemed arguments waived and have declined to address them where a party does not cite to any authority in support and does not develop its argument."), *R&R adopted sub nom Gonzalez v. Kijakazi*, 2022 U.S. Dist. LEXIS 144530 (S.D.N.Y. Aug. 12, 2022).

Finally, Defendants argue that an unjust enrichment claim is only available in the absence of a contract, and Count 10 must therefore be dismissed.  Doc. 28 at 24.  Poulard does not respond to this argument.  Doc. 29 at 22.  Because "the existence of a valid and binding contract preclude[s] a claim for unjust enrichment," courts "in this District have previously dismissed unjust enrichment claims that were indistinguishable from contract claims pleaded in the alternative in the same complaint, at least where the parties did not dispute that they shared a contractual relationship."  *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, No. 21-cv-859 (NRB), 2022 U.S. Dist. LEXIS 32975, at *9 (S.D.N.Y. Feb. 23, 2022) (internal quotation marks and citations omitted).  Accordingly, Count 10 is dismissed on this ground as well.

### C.  The Court Will Not Award Attorneys' Fees

In the motion to dismiss, Defendants asked the Court to award attorneys' fees pursuant to the non-disparagement clause and other provisions of the Agreement.  Doc. 28 at 25.  Poulard opposed the award on the basis that his allegations in the complaint are entitled to absolute privilege for statements made in the course of litigation, and, because Defendants' argument was so "laughable and frivolous," the Court should instead award him attorneys' fees.  Doc. 29 at 23.  On reply, Defendants conceded that the complaint

did not violate the non-disparagement clause and withdrew the request.  Doc. 31 at 13.
Because Defendants withdrew their request, and Poulard cites no authority that he is
entitled to attorneys' fees, the Court will not award either party attorneys' fees.

### D.  The Court Will Grant Poulard Leave to Amend

Although Poulard did not request leave to amend in the alternative, the Court will
grant him leave to amend should he choose to do so.  Courts are instructed to "freely give
leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The
Second Circuit has instructed courts not to dismiss a complaint "without granting leave to
amend at least once when a liberal reading of the complaint gives any indication that a
valid claim might be stated."  *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013)
(citation omitted); *see also Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797
F.3d 160, 190–91 (2d Cir. 2015) (reaffirming the "liberal spirit" of Rule 15 and
counseling strongly against the dismissal of claims with prejudice prior to "the benefit of
a ruling" that highlights "the precise defects" of those claims).

This is the Court's first opportunity to highlight the precise defects of Poulard's
pleading.  Moreover, if Poulard can establish that he in fact made reasonably
investigative efforts once the duty to inquire arose or that tolling is otherwise available to
render his claims timely, an opportunity to amend would not be futile.  The Court will
therefore permit him to replead the dismissed claims.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion is GRANTED.  Should Poulard wish to amend his complaint, he must do so by February 9, 2024.  If he does not file an amended complaint by then, the case will be closed.

The Clerk of Court is respectfully directed to terminate the motion (Docs. 27, 28, and 31).

It is SO ORDERED.

Dated:    January 19, 2024
          New York, New York

_____
                EDGARDO RAMOS, U.S.D.J.