UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGINAL POULARD,

                    Plaintiff,

       – *against* –

GUY-MAX DELPHIN, DELPHIN
INVESTMENTS, LLC, *and* AMITIE
ALTERNATIVE CAPITAL PARTNERS,
LLC,

                  Defendants.

**OPINION & ORDER**

23-cv-791 (ER)

RAMOS, D.J.:

       Reginal Poulard brought this action against Guy-Max Delphin and his companies, Delphin Investments, LLC ("Delphin Investments") and Amitie Alternative Capital Partners, LLC ("AACP") (collectively, "Defendants"), arising from an allegedly fraudulent investment that Delphin induced Poulard to make in Delphin's companies. Doc. 1. Before the Court is Defendants' motion to dismiss Poulard's Second Amended Complaint in its entirety. Doc. 39. For the reasons set forth below, the motion is GRANTED.

## I.    BACKGROUND

### A. Factual Background

       The Court assumes familiarity with the facts of the case, which are discussed in detail in the Court's opinion dated January 19, 2024 (the "January 19 Opinion" or the "Opinion"). *See* Doc. 33. For purposes of the instant motion, the relevant facts are detailed below.

       Poulard is a Haitian national and U.S. citizen who immigrated to the United States in 2010. Doc. 34 (Second Amended Complaint) ¶¶ 1, 13–14. Delphin is a Haitian national and U.S. citizen. *Id.* ¶¶ 2, 17. Poulard met Delphin in the United States in January 2015 after being introduced by a mutual friend, Jacques Armand, who went to

high school with Delphin in Haiti. *Id.* ¶¶ 17, 19. Delphin had told Armand that he operated a profitable hedge fund, Delphin Investments, and presented Armand an opportunity to invest in it. *Id*. ¶ 20. Delphin also encouraged Armand to market the investment opportunity to others. *Id.* ¶ 22.

Accordingly, in January 2015, Armand informed Poulard of the opportunity to invest in Delphin Investments and connected Poulard to Delphin by email and phone that same month. *Id.* ¶¶ 23–24. Delphin then explained to Poulard that any money he invested in Delphin Investments would be used to purchase equities in various pension funds and pharmaceutical companies. *Id.* ¶¶ 24–25. What Delphin did not explain to Poulard at the time, however, was that Poulard's investment would actually be placed in AACP, which owned a 15.86% share in Delphin Investments. *Id*. ¶ 26. Delphin told Poulard that his returns would be determined by Delphin Investments' performance, but also that Poulard would receive a distribution each quarter for six years, at which point Delphin would buy out Poulard's investment. *Id*. ¶¶ 27–28.

On February 4, 2015, Poulard executed a subscription and adoption agreement to invest in AACP ("the Agreement").[1] *Id.* ¶ 31; *see also* Doc. 34-2 (Agreement).[2] According to the Agreement, Poulard would invest $250,000 in exchange for an "equity interest" in "AMITIÉ CAPITAL PARTNERS, LLC ("AACP")[.]" Doc. 34-2 at 1, 6. Additionally, Poulard would have a "guaranteed exit strategy at a predetermined price based on the metrics set forth [in the Agreement]." *Id.* at 1. Specifically, "[s]tarting 2021 and thereafter, [Poulard would] have the right to sell to Delphin Investments [his] AACP equity stake for the greater of 2x revenues or 2.5x EBITDA (based on values at December 31st, or that year in question)." *Id.* The Agreement estimated that the implied internal rate of return was "expected to be approximately 18%." *Id.* Additionally, though

---

[1] The Agreement is governed by Connecticut law. Doc. 34-2 at 2.

[2] The copy of the Agreement that Poulard attached as an exhibit to the complaint is signed by him but not countersigned by Delphin, Delphin Investments, or AACP. *See* Doc. 34-2 at 11.

the Agreement contained disclosures of certain risk factors, including loss of the principal (*id.* at 2), Delphin separately assured Poulard that his returns were guaranteed. Doc. 34 ¶ 38. Delphin also promised Poulard a total of $939,834 in distributions over the six years, including Delphin's buyout of $614,524 in 2021, which were "the lowest possible returns" Poulard could receive. *Id.* ¶¶ 29, 38; *see also* Doc. 34-1 (March 8, 2015 Email).

Poulard thereafter wired three payments to Delphin Investments: $100,000 on April 21, 2015 (Doc. 34 ¶¶ 39, 41; Doc. 34-4 (April 2015 Account Statement) at 3); $50,000 on August 11, 2015 (Doc. 34 ¶ 43; Doc. 34-5 at 3); and $25,000 on January 25, 2016 (Doc. 34 ¶ 45; Doc. 34-6 at 3). Poulard also wired Delphin Investments another $35,000,[3] bringing his total investment to $210,000. Doc. 34 ¶ 47. Unbeknownst to Poulard, none of these payments were ever transferred to AACP,[4] nor used to purchase the equities that Delphin had represented he would purchase. Doc. 34 ¶¶ 35–36, 48; Doc. 34-2 at 2. Instead, nearly all of the money was used for other purposes, including what Poulard alleges were Delphin's personal expenses. Doc. 34 ¶¶ 42, 44, 46, 49; Doc. 34-4 at 4; Doc. 34-5 at 3–4; Doc. 34-6 at 3–5.

Poulard frequently asked Delphin when the distributions would be paid and, at first, Delphin repeatedly promised they would be paid.[5] *Id.* ¶¶ 51–52. On October 16, 2018, more than three years after Poulard's initial investment, Armand began emailing Delphin to ask why he and Poulard had not received distributions and inquire about returning their respective investments.[6] *Id.* ¶ 58; Doc. 34-7 (Email Thread of 29 Emails

---

[3] Poulard does not specify the date of the $35,000 payment, nor does he specify if it was made in a single wire transfer or multiple installments. *See* Doc. 34 ¶ 47.

[4] Delphin directed Poulard to wire payments to Delphin Investments' bank account at Bank of America rather than AACP's account at Wells Fargo. Doc. 34 ¶¶ 40–41.

[5] Poulard does not state when he made the requests or when Delphin represented that the distributions would be paid.

[6] The Court previously noted in its January 19 Order that Poulard's FAC did not "explain why Armand was emailing Delphin to complain about the fact that *Poulard* was not being paid on his investment." Doc. 33 at 4, n. 5. In the SAC, Poulard explains that he was frequently out of the country for extended periods of time during 2019–2023 and therefore relied on Armand to communicate with Delphin. Doc. 34 ¶ 58, n. 4. However, the Court notes that Poulard has still not explained why Armand was sending emails on his

Between Armand, Delphin, Poulard, and Delphin's attorney from October 16, 2018 to November 9, 2020)[7] at 21. Delphin responded the same day, emphasizing that Poulard "did not invest in any of our hedge fund[s] or traditional products managed at Delphin Investments (Investment Management firm)" but had instead "made an equity investment (profit sharing) into the investment management firm ([Delphin Investments]) via [AACP]." Doc. 34-7 at 21. Delphin also noted:

> While this is not what an investor wants to hear, not until we have strong free cash flows, we would not attempt buying out any investors. But I've added [Poulard] to the list [of investors seeking to be bought out] for when that possibility arises. This may not be for years to come and only if we are able to turn the business around. Otherwise, the investment in [sic] valued at $0.

*Id.* at 20–21.

Nearly one year later, on September 21, 2019, Armand contacted the SEC by email to request an investigation into the investments he and Poulard had made with Defendants. Doc. 34 ¶ 55; Doc. 34-8 (September 21, 2019 Email to the SEC). In the email, Armand alleged that Delphin never paid the dividends that were promised beginning "by and around the first quarter of 2018" and that Delphin "seem[ed] to be trying to change the terms of the agreement signed as a mean [sic] to circumvent the fulfillment of his obligations/commitments" in a "flagrant fraud attempt." Doc. 34-8 at 1–2. Armand also wrote that "Delphin cannot be trusted" and that "Delphin Investments is a scam." *Id.* at 2. Poulard was not copied to this email. *See id* at 1.

A month later, on October 24, 2019, Armand again emailed Delphin and questioned if he and Poulard had been "duped" and stated that they "may have been subject to: fraud, deceit[,] and misrepresentation of facts." Doc. 34-7 at 18. Responding

---

behalf in 2018. Nor does Poulard state whether Armand forwarded the 2018–2019 emails to him or otherwise discussed them with him. Poulard was ultimately copied to the email chain on November 1, 2019. Doc. 34-7 at 11–12.

[7] The SAC states that the email chain between Armand, Delphin, Poulard and Delphin's attorney (Doc. 34-7) contains emails dated October 16, 2018–November 1, 2020. *See, e.g.,* Doc. 34 ¶ 58. However, there are two emails that fall outside this range, dated November 8 and November 9, 2020. Doc. 34-7 at 1–2.

the same day, Delphin continued to reiterate that, pursuant to the Agreement, Armand and Poulard had invested only in the company, not the fund, and would therefore only participate in Delphin Investments' net operating profits in the year following a positive operating profit (which was originally estimated to be 2015, but not guaranteed), but it had not been profitable thus far, so no distributions were due. *Id.* at 14–15.  Armand responded the same day that this was all a "premeditated dishonest scheme," by which Delphin would not return any invested capital and instead "hid[e] behind the language of a document." *Id*. at 14.  Minutes later, Delphin responded that they had lost their biggest client, who represented 90% of the revenue, but "[a]s long as the company exists[,] your ownership in the company remains and capital will be distributed when and if profitable and according to what was signed." *Id.* at 13.  Delphin also indicated that he would forward his communications with Armand to his lawyer. *Id.*

The next day, on October 25, 2019, Delphin's counsel emailed Armand to arrange a group call with him and Poulard "or their lawyers if represented." *Id.* at 12.  Copying Poulard on the email thread for the first time,[8] on November 1, 2019, Armand requested a copy of the past five years' financial statements. Doc. 34 ¶ 59; Doc 34-7 at 11–12.  The same day, Delphin attached tax returns from 2014 to 2018,[9] alleged that Armand's prior comment about a "premeditated dishonest scheme" was defamatory, asked Armand to find a lawyer, and reiterated that "for your buyout, you have to adhere to what is in the document and signed." Doc. 34-7 at 10.  Later that same day, Delphin sent another email to Armand reiterating that he would only communicate "via legal representations and the newsletters when available." *Id.* at 9.  Delphin also, in what Poulard alleges was an attempt to discourage him and Armand from pursuing litigation, instructed his attorney to "please note the constant harassment and character defamation and what that also means

---

[8] Poulard is copied to all emails that were sent on and after November 1, 2019. *See* Doc. 34-7.  It appears he was able to see the prior messages when he was copied to the chain.

[9] Although the tax returns were purportedly attached to Delphin's November 1, 2019 email, they were not attached to the emails attached as an exhibit to the complaint. *See* Doc. 34-7.

legally against these folks."[10]  *Id.* at 9; Doc. 34 ¶¶ 54, 60.  Delphin also blocked Poulard's phone number, allegedly to prevent Poulard from asking for his money back.  Doc. 34 ¶ 54.

On November 7, 2019, Armand emailed Delphin and his counsel, attaching a "self-explanatory" article.[11]  Doc. 34-7 at 6.  The next day, Delphin's counsel replied that he would review it with Delphin.  *Id.* at 5.  Two months later, on January 3, 2020, Armand followed up with Delphin about the "below mentioned review."[12]  Doc. 34 ¶ 61; Doc. 34-7 at 5.  Delphin replied the same day, asking Armand to remove Delphin's previous counsel from future communications because he had engaged another law firm.  Doc. 34 ¶ 62; Doc. 34-7 at 5.  Delphin went on to describe the newly engaged law firm as "one of the most prominent law outfits (if not the biggest) in the US" and therefore "expensive."  *Id.*  Delphin warned Armand that any payment for their legal services would "obviously com[e] out of Delphin Investments" and asked that Armand give them until the end of the month to provide "a formal answer and reasonable path forward."  Doc. 34-7 at 5.  Poulard alleges this email constituted a threat to deplete his and Armand's investment and prohibit any potential recovery in order to discourage them from pursuing litigation.  Doc. 34 ¶ 62; Doc. 34-7 at 5.

Armand responded the next day, telling Delphin that he and Poulard "seem to perceive through [the email] below an apparent willingness to return [Poulard's] money" and requested a formal answer, a reasonable path forward, and the return of Poulard's investment.  Doc. 34 ¶ 63; Doc. 34-7 at 4.  The same day, Delphin replied to the email

---

[10] In the SAC, Poulard alleges that Delphin asked his lawyer to "explain the legal ramifications of [the accusations of constant harassment and character defamation" to Poulard and Armand.  Doc. 34 ¶ 60.  However, the Court notes that the email itself, which is attached as an exhibit to the complaint, shows Delphin told his attorney to "note" and not "explain."  Doc. 34-7 at 9.  The next day, Delphin's attorney replied to the email, but only to ask Delphin for a "side bar to discuss."  *Id.* at 8.

[11] Armand attached images to this email, presumably of the article he references, but they are unviewable on the Court's CM/ECF system.  Doc. 34-7 at 5.

[12] It is unclear whether the "review" referenced in the Jan. 3, 2020 email is the same article referenced in the Nov. 11, 2019 email or something else entirely.  Doc. 34-7 at 5–6.

chain: "It will get done."  Doc. 34 ¶ 64; Doc. 34-7 at 4.  Delphin's response left Armand and Poulard with the impression that Delphin intended to return their investment.  Doc. 34 ¶ 64.

One month later, on February 1, 2020, Armand again emailed Delphin to ask that Delphin return Poulard's investment.  Doc. 34 ¶ 65; Doc. 34-7 at 4.  The same day, Delphin replied:  "Allows [sic] us additional time as we are working on it."  Doc. 34 ¶ 66; Doc. 34-7 at 3.  Armand again emailed Delphin and Poulard on February 22, 2020 to ask for an update regarding the return of Poulard's investment.  Doc. 34-7 at 3.  Four days later, on February 26, 2020, Delphin emailed back that Delphin Investments was "working on a new contract" that might impact the company's cash flows.  *Id.* at 2–3.

Eight months later, on November 8, 2020, Poulard (weighing in on the email chain for the first time) emailed Delphin and Armand:[13]  "You guys convinced me to join this mess. . . . I have not seen any bloody cash distribution for the past 5 years.  Can you guys tell me what is going on?  When will I ever see the cash distribution that [Delphin] has been talking about?"  *Id.* at 2.  The next day, Delphin emailed back that it had "been challenging times for all of us," but he was "still trying to find a way as we are still not profitable," and the Agreement's conditions to distributions were therefore not met, but he was "working on finding a [sic] to help buy you out" and would "circle back as soon as possible with options to help get this resolve [sic] in a way that works for [Poulard] and the company."  *Id.* at 1.  He anticipated that Delphin Investments would be in better financial condition in 2021, "[b]ased on all activities in our pipeline currently."  *Id.*  Delphin also noted, however, that he was still working on finding an investor to buy Poulard out of his ownership in the company.  *Id.*

---

[13] The SAC states that Armand followed up with Delphin in November 2020 and cites the email chain dated October 16, 2018–November 9, 2020.  The Court notes, however, that the only email sent to Delphin in November 2020 is from Poulard, not Armand.  Doc. 34 ¶ 67; Doc. 34-7 at 2.

Poulard trusted that Delphin was working to arrange for the return of his investment, and on May 28, 2021, Poulard emailed Delphin to follow-up.  Doc. 34 ¶¶ 68–69.  Four days later, on June 1, 2021, Delphin told Poulard that "we continue to work diligently at finding [sic] optimal solution for [Delphin Investments], its clients and owners like yourself[.]"[14]  *Id.* ¶ 70.  On September 22, 2021, after the "guaranteed buyout" provision should have come into effect, Poulard informed Delphin that he wished to be bought out of his position in AACP by November 30, 2021.  Doc. 34 ¶ 71; Doc. 34-10 (September 22, 2021 Letter).  Delphin refused to buy Poulard out of his investment.  Doc. 34 ¶ 72.

Since then, Delphin has ceased responding to Poulard's communications and has not paid Poulard either his principal investment or any returns.  Doc. 34 ¶ 74.  Meanwhile, throughout 2020 and 2021, Armand and Poulard repeatedly called the SEC to determine the status of any investigation they might be making into Defendants, but were "repeatedly informed that the SEC could not provide [Poulard and Armand] this information."  Doc. 34 ¶ 56.  They also filed a complaint with FINRA.[15]  *Id.* ¶ 57; Doc. 34-9 (Confirmation of receipt of FINRA Complaint).  In January 2022, Poulard determined that Delphin's repeated promises to return his funds were false and retained counsel to attempt to secure a return of his funds.  Doc. 34 ¶ 75.  At the request of Poulard's counsel, Delphin provided documents relating to Poulard's investment, including bank statements for the Delphin Investments account, which revealed for the first time how Delphin had actually spent Poulard's funds.  *Id.* ¶¶ 76–78.  The bank statements show, among other withdrawals and debits, transfers of funds to other accounts; payroll; and payments to Verizon Wireless, American Express, Aetna, CityMD, grocery stores and restaurants, a wine store, a life insurance provider, cable bills, research

---

[14] Poulard did not append either the May 28 or June 1, 2021 emails to the complaint.  *See* Doc. 34.

[15] Poulard does not recall the exact date he made the FINRA Complaint, but he believes it was filed in late 2021. Doc. 34 ¶ 57, No. 3.

services, and an office rental agency.  *See* Docs. 34-4–34-6.  Poulard alleges that these withdrawals and debits were for Delphin's personal use and not for business purposes. Doc. 34 ¶¶ 42, 44, 78.

Throughout 2022 and 2023, Delphin continued to raise funds for Delphin Investments through private sales of various unregistered funds.  Doc. 24 ¶ 80.  On December 19, 2022, he disclosed sales of $178,361 in shares of "Delphin Multi-Asset Fund," and $407,200 in shares of "Delphin Caribbean Resilience Fund L.P." to the SEC on Form D's.[16]  Doc. 34 ¶¶ 81–82; Doc. 34-11 (SEC Form D dated December 19, 2022) at 4; Doc. 34-12 at 4.  On July 31, 2023, Delphin disclosed the sale of $1,368,704 in shares of "AIMCOV200 Fund, LP."  Doc. 34 ¶ 83; Doc. 34-13 at 4.  On December 21, 2023,[17] Delphin made two more disclosures, one for the sale of an additional $178,361 in shares of "Delphin Multi-Asset Fund," and $407,200 in shares of "Delphin Caribbean Resilience Fund LP."  Doc. 34 ¶¶ 84–85; Docs. 34-14–34-15 at 4.  Each of the forms list Delphin Investments, LLC, or Delphin as the "Investment Manager" or "General Partner" of the fund/issuer.  Doc. 34 ¶¶ 81–85; Docs. 34-11–34-15 at 5.  Despite allegedly using these corporate entities to raise over $2,500,000 and receiving an influx of significant investments in 2022 and 2023, Delphin never returned Poulard's funds, arranged for another investor to purchase Poulard's investment, or made the promised distributions to Poulard.  Doc. 34 ¶ 86.

## B.  Procedural History

Poulard initially filed this action against Delphin, Delphin Investments, and AACP on January 31, 2023, and first amended his complaint (the "First Amended Complaint" or the "FAC") on April 26, 2023.  Docs. 1, 19.  Defendants moved to dismiss the FAC on May 2, 2023.  Doc. 20.  On January 19, 2024, the Court issued an Opinion

---

[16] Form D is an SEC filing for unregistered securities transactions under the Securities Act of 1933.

[17] The SAC states that these forms were filed on Dec. 12, 2023, but the document reflects that they were filed on Dec. 21, 2023.  *See* Docs. 34-14–34-15 at 5.

and Order (the "January 19 Opinion") granting Defendants' motion.  Doc. 33.  The January 19 Opinion held that all of Poulard's claims were barred by the relevant statutes of limitations, and that his claims for common law fraud, fraudulent inducement, fraudulent concealment, breach of contract, conversion, and unjust enrichment also failed to state a claim upon which relief can be granted.[18]  *Id*.

Although Poulard did not request leave to amend his complaint, the Court granted Poulard leave to replead the dismissed claims in order to establish that he in fact made reasonable investigative efforts once the duty to inquire arose or that tolling is otherwise available to render his claims timely.  *Id*. at 20.  Poulard thereafter filed a second amended complaint (the "SAC") on February 9, 2024.  Doc. 34.  The SAC alleges the same nine counts as the previous complaints:  common law fraud, fraudulent inducement, fraudulent concealment, breach of contract, breach of fiduciary duty, misrepresentations and omissions, breach of the duty of good faith and fair dealing, conversion, and unjust enrichment.  *See id*.

On February 16, 2024, Defendants submitted a letter to the Court again requesting permission to file a motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and New York Civil Practice Law and Rules §§ 213(2), 213(8), 214(3) and 213(4).  Doc. 35.  On March 6, 2024, the Court held a pre-motion conference, and on March 21, 2024, Defendants moved to dismiss the SAC.  Docs. 39–40.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6): Failure to State a Claim

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  A court is not required to credit "mere conclusory statements" or "threadbare

---

[18] The Court further ruled that it would not award attorney's fees because the request was withdrawn by Defendants on reply and Poulard, who requested attorney's fees in his response to the motion, cited no authority for his request.  *See* Doc. 33 at 19–20.

recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 554, 555 (2007)); *see also id.* at

681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint

must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its

face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*,

550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show

"more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff

has not "nudged [his] claims across the line from conceivable to plausible, [the]

complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

  The question on a motion to dismiss "is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs*

*for Justice v. Nath*, 893 F.Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc.*

*v. Town of Darien*, 56 F.3d 375, 378 (2d. Cir. 1995)) (internal quotation marks omitted).

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined

fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without

resolving a contest regarding its substantive merits,'" and without regard for the weight

of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*,

644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City*

*of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

  In considering a Rule 12(b)(6) motion, a district court may consider the

complaint, exhibits thereto, and any document incorporated by reference or integral to it.

*ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*,

736 F.3d 213, 219 (2d Cir. 2013)). Courts most commonly recognize documents as

incorporated by reference or integral where "the incorporated material is a contract or

other legal document containing obligations upon which the plaintiff's complaint stands

or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). Accordingly, when considering a motion to dismiss breach of contract claims, courts will look "at the contract itself, which by definition is integral to the complaint." *Sobel v. Major Energy Services, LLC*, No. 19-cv-8290 (GBD), 2020 U.S. Dist. LEXIS 137832, at *13 (S.D.N.Y. July 31, 2020). "If a document integral to the complaint contradicts that complaint, the document controls, and the court need not accept the complaint's allegations as true." *Trustpilot Damages LLC v. Trustpilot, Inc.*, No. 21-cv-432 (JSR), 2021 U.S. Dist. LEXIS 121150, at *9 (S.D.N.Y. June 29, 2021) (citations omitted).

## III.    DISCUSSION

### A.  Poulard's Claims are All Time Barred by the Relevant Statutes of Limitations

Defendants allege that all nine of Poulard's causes of action are untimely. Doc. 40 at 7–10. Poulard responds that Counts 1–3 are within the relevant discovery period for fraud claims, that he made reasonable investigative effort after his duty to inquire arose, and that Defendants are equitably estopped from raising any statute of limitations defenses as to the remaining six claims. Doc. 41 at 9–12.

#### 1.  Counts 1 (Common Law Fraud), 2 (Fraudulent Inducement), and 3 (Fraudulent Concealment) are Time-Barred

The parties continue to agree that Counts 1 through 3, which all sound in fraud, are governed by C.P.L.R. § 213(8). Doc. 40 at 7; Doc. 41 at 5. Pursuant to § 213(8), the time within which actions based upon fraud must be commenced "shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." As determined in the January 19 Opinion, Poulard's causes of action for fraud accrued in early 2015, more than six years before Poulard filed the initial complaint in January 2023.

*See* Doc. 33 at 9–10. Thus, Poulard's claims will only be timely if brought within two years of when he discovered the fraud or "could with reasonable diligence have discovered it." The initial complaint was filed on January 31, 2023 (Doc. 1). Accordingly, the claims will be untimely if the alleged fraud was discoverable with reasonable diligence before January 31, 2021.

Poulard argues that he timely brought the claims within the two-year discovery period because he did not have sufficient knowledge to adequately state a claim for fraud until he came into possession of Defendants' bank statements in January of 2022 and "discovered," for the first time, how his investment had actually been used. Doc. 41 at 11–12. Poulard argues that the statute of limitations thus began running in January 2022, even if that was "after [his] duty to inquire arose and [he] began his investigative efforts." Doc. 41 at 12. In making this argument, Poulard cites *City of Pontiac General Employees' Retirement System. v. MBIA Inc.*, 637 F.3d 169 (2d Cir. 2011) and *Saint-Jean v. Emigrant Mortgage. Co.*, 50 F.Supp. 3d 300 (E.D.N.Y. 2014). *Id.* Defendants respond that *City of Pontiac* and *Saint-Jean* concern tolling under federal law, not New York state law, and therefore do not apply to the case at bar. Doc. 43 at 5. Defendants further argue that the correct standard is actual *or* inquiry notice, and under this standard, the statute began to toll no later than September 21, 2019, the day Armand contacted the SEC by email, which contained "the words of a man holding 'suspicions' of fraud . . . a man who has a very firm belief that fraud was committed." *Id.*; Doc. 40 at 2–4, 6–7. Defendants argue that "subjective belief of fraud . . . starts the clock running." Doc. 40 at 6. In reply, Poulard argues that he "did believe Defendants had wronged him" and "knew that in order for the SEC to initiate an investigation into Defendants, he would obviously have to allege wrongdoing by Defendants" but that "it does not matter when [he] may have 'believed' he had been defrauded, even if [he] had a 'very firm belief.'" Doc. 41 at 10–12.

While subjective belief alone does not trigger the duty of inquiry, (*Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (N.Y. 2009) ("Generally, knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute.") (citation omitted)), *City of Pontiac* and *Saint-Jean* do not support Poulard's position because they do not apply to actions arising under C.P.L.R. § 213(8).  *Ayers v. Piaker & Lyons*, *P.C.*, 748 Fed. Appx. 368, 370 (2d Cir. 2018) ("[T]he standard announced in *City of Pontiac* does not apply outside the context of actions pursued under Section 10(b) of the federal securities law, 15 U.S.C. § 78(j)(b), and that is so because we were construing a particular federal statute of limitations, 28 U.S.C. § 1658(b).").  Rather, and as set forth in the January 19 Opinion, the statute of limitations for a § 213(8) cause of action begins running when "the plaintiff was possessed of knowledge of facts from which [the fraud] could be reasonably inferred" (*Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (citation omitted) (alteration in original)) and not, as Poulard argues, when "[Poulard] possessed adequate information to plead a claim for fraud."  Doc. 33 at 11; Doc. 41 at 12.  Again, while the January 2022 receipt of the bank statements may have been the first *actual* notice Poulard had of the fraud, it does not start the clock under the discovery exception if Poulard had earlier *inquiry* notice.  The Court previously held that Poulard's duty to inquire was unquestionably triggered at the very latest on November 8, 2020, when Poulard himself emailed Delphin and expressed his reason to suspect the fraud.  Doc. 33 at 12.  *See Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 137 F.Supp. 3d 430, 462 (S.D.N.Y. 2015).

As stated in the January 19 Opinion, "even if Poulard never saw any of Armand and Delphin's emails when they were sent, he at the very least expressed his own suspicion when he emailed the chain on November 8, 2020."  Doc. 33 at 14.  Thus, because the SAC contains no additional allegations that definitively shed light on

*Poulard's* knowledge of the facts before November 8, 2020,[19] the Court once again concludes that Poulard's duty of inquiry was triggered, at the very latest, on November 8, 2020.[20]  *See* Doc. 34 ¶¶ 55–57; Doc. 33 at 13–14.   In other words, Poulard's January 31, 2023 complaint is untimely unless he can show that he made reasonably diligent investigative efforts to discover the fraud once his duty to inquire arose on November 8, 2020.

Poulard argues that he made reasonable efforts to investigate the facts underlying his fraud claims because he "ke[pt] in constant communication with Mr. Delphin to attempt to obtain information about his investment and/or the return of his funds," inquired with the SEC in 2019, continued to follow up with the SEC by phone throughout 2020 and 2021, and contacted FINRA in late 2021.  Doc. 41 at 10–11; *see* Doc. 34 ¶ 57, n. 3.  Defendants argue that this is insufficient, namely because Armand "did **not** contact the SEC as part of an 'investigation'" but had already "decided that he and Poulard had been defrauded" (emphasis in original) and simply "wanted the SEC to help get his and Poulard's money back."  Doc. 40 at 6–7.  Defendants also argue that "'reasonable investigative efforts' are needed only up to the time when the plaintiff has accumulated sufficient facts that he had concluded (or a reasonable person would conclude) that he was possessed of knowledge of facts from which the fraud could be reasonably inferred."  Doc. 40 at 6 (citing the January 19 Opinion).  Poulard does not cite to any legal authority in support of his arguments, only noting that "the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide . . . and thus an

---

[19] Although the SAC also alleges that Poulard and Armand jointly contacted FINRA in late 2021 and called the SEC throughout 2020 and 2021, the exact dates of these inquiries are not provided, making it difficult to ascertain Poulard's specific knowledge during those time periods.  *See* Doc. 34 ¶¶ 55–56; Doc. 34 ¶ 57, n. 3.

[20] Defendants argue that the duty to inquire was actually triggered over a year earlier, on September 21, 2019, when Armand sent the SEC email inquiry.  Doc. 40 at 6–7.  However, the SAC states that "*Armand* contacted the SEC in order to request that the SEC initiate an investigation into Defendants in regard to [Armand's and Poulard's] investments."  Doc. 34 ¶ 55 (emphasis added).  The email itself, attached to the complaint, confirms that Poulard did not send the email to the SEC, nor was he copied.  See Doc. 34-8 (Email to SEC dated September 21, 2019).

inappropriate basis for dismissal of [Poulard's] fraud claims at this early stage." Doc. 41 at 11 (quoting *Lenz v. Associated Inns & Restaurants Co. of America*, 833 F.Supp. 362, 371 (S.D.N.Y. 1993) (internal quotations omitted). However, dismissal is appropriate "where it conclusively appears that the plaintiff has knowledge of facts which should have caused [him or] her to inquire and discover the alleged fraud" *Cannariato v. Cannariato*, 24 N.Y.S.3d 214, 216 (N.Y. App. Div. 2016) (quoting *Rattner v. York*, 571 N.Y.S.2d 762, 765 (N.Y. App. Div. 1991)) (internal quotations omitted). "Thus, while it is true that New York courts will not grant a motion to dismiss a fraud claim where the plaintiff's knowledge is disputed, it is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued." *Koch v. Christie's International PLC*, 699 F.3d 141, 155–56 (2d Cir. 2012).

As Poulard "relies upon the two-year discovery exception to the six-year limitations period, '[t]he burden of establishing that the fraud could not have been discovered prior to the two-year period before the commencement of the action rests on [Poulard] who seeks the benefit of the exception[.]'" *Cannariato v. Cannariato*, 24 N.Y.S.3d 214, 216 (N.Y. App. Div. 2016) (quoting *Sargiss v. Magarelli*, 858 N.Y.S.2d 209, 210 (N.Y. App. Div. 2008) (first alteration in original). Furthermore, Poulard must show that "*even if* [he] had exercised reasonable diligence, [he] could not have discovered the basis for [his] fraud claims." *Aozora Bank, Ltd. v. Credit Suisse Group*, 144 A.D.3d 437, 438 (N.Y. App. Div. 2016) (emphasis added). The only evidence before the Court of Poulard's efforts on or after November 8, 2020 are the phone calls made to the SEC in 2020 and 2021,[21] the FINRA inquiry filed in late 2021, and any of the generally alleged "constant communication" with Defendants that took place on or after November 8, 2020.

---

[21] Poulard does not identify the number of times he contacted the SEC, nor any of the dates that the phone calls were placed. *See* Doc. 34 ¶ 56.

As an initial matter, because Poulard is relying on the discovery rule, the statute of limitations begins running "from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8) (McKinney 2010). Here, Poulard's fraud claims are based on three primary misrepresentations: "that [his] investment [. . .] would be used to purchase equities, that [he] would have a guaranteed exit from his investment, and that [he] would receive consistent distributions and a guaranteed return of at least 18% on his investment." Doc. 34 ¶ 91; *see also id.* ¶¶ 98, 106. However, on November 9, 2020, Delphin responded to Poulard's November 8 email and told him that he was "still trying to find a way" to distribute dividends to Poulard but that Delphin Investments was "still not profitable." Doc. 34-7 at 1. Delphin also reminded Poulard of the terms of their Agreement, stating, "[a]gain, to be bought out (refunded) the investment [. . .] you provided for the working capital and operation of the company, as you can imagine given [the] current global situation, we are still in no position yet to do so." *Id.* Therefore, Poulard had actual knowledge that he would not be receiving "consistent distributions"—not to mention actual knowledge that he had yet to receive *any* distributions—as of that date. *See* Doc. 34 ¶ 74. He was also made aware that he wasn't *guaranteed* a buyout of his investment unless Defendants were profitable. *See* Doc. 34-7 at 1. Therefore, the statute of limitations for these two alleged misrepresentations began running on November 9, 2020, at the very latest. Consequently, Poulard's January 2023 filing is outside the applicable statute of limitations period for these claims. The only fraud that Poulard arguably wasn't aware of was the alleged misrepresentation that his investment would be used to purchase equities. Consequently, the only misrepresentation potentially subject to the discovery rule is the claim that his investment would be used to purchase equities.

The Court finds that Poulard's investigative efforts are insufficient to demonstrate reasonable diligence as to the use of his investment. First, Poulard points to the phone

calls he made to the SEC as evidence of his investigative efforts.  Doc. 41 at 10–11.
However, this argument is belied by the SAC itself, which states that Poulard kept asking
the SEC if they had initiated an investigation and for updates on its progress but was
"repeatedly informed that the SEC could not provide [Poulard and Armand] this
information."  Doc. 34 ¶ 56.  Therefore, the phone calls made to the SEC do not
constitute reasonably diligent investigative efforts.  Poulard also points to the complaint
he filed with FINRA in late 2021 as evidence of his investigative efforts.  Doc. 34-9; Doc.
34 ¶ 57;  Doc. 41 at 10–11.  Poulard does not include the FINRA complaint itself, only a
copy of the confirmation that it was received, and the complaint was filed a year after
Poulard's duty to inquire arose.  *Id.*  But even if Poulard's sole FINRA inquiry constitutes
due diligence, he has not explained why "[he] could not have discovered the basis for
[his] fraud claims" through FINRA.  *See Aozora Bank*, 144 A.D.3d at 438.  The SAC
makes no reference to the outcome of the FINRA investigation whatsoever.  *See* Doc. 34
¶ 57.  Therefore, the FINRA inquiry does not toll the statute of limitations.

Finally, Poulard points to his communications with Defendants as evidence of his
investigative efforts.  Doc. 41 at 10–11.  The SAC only discusses four emails sent on or
after November 8, 2020.  Doc. 34-7 at 1–2; Doc. 34 ¶¶ 67, 69–70.  The first two emails
were already included in the FAC.  Doc. 34-7 at 1–2.  The SAC also discusses two new
emails. Doc. 34 ¶¶ 69–70.  On May 8, 2021, Poulard asked about the return of his funds,
to which Defendants replied on June 1, 2021 that Defendants were "work[ing] diligently
on finding [sic] optimal solution for [Delphin Investments], its clients and owners like
yourself[.]"  *Id.*  Defendants argue that these new emails, while not attached as exhibits,
"simply continue[] the discussion set forth in [the email chain dated October 16, 2018–
November 9, 2020]" and therefore do not constitute reasonable investigative efforts.
Poulard argues that Defendants "refused to provide information to [Poulard] about how
his investment [. . .] had been used, or Defendants' financial condition."  Doc. 41 at 5–6.
However, the SAC and attached emails lack any allegations of such refusals.  *See* Docs.

34, 34-7.  Furthermore, Poulard never asked Defendants how his investment was being

used, either before or after his duty of inquiry arose, until January 2022.  *See id*; Doc. 34

¶¶ 75–79.  Poulard also cites no legal authority to support the argument his

communications with Defendants are somehow sufficient to show that "the fraud could

not have been discovered[.]"  *Cannariato*, 24 N.Y.S.3d at 216.  As Poulard does not

explain why he never inquired about the use of his funds until January 2022 (Doc. 34 ¶¶

75–79), he has not met his "burden of establishing that the fraud could not have been

discovered prior to the two-year period before the commencement of the action."

*Cannariato*, 24 N.Y.S.3d at 216.

      In the alternative, Poulard argues that his claims are not untimely because

Defendants' "[f]raudulent concealment of the existence of a cause of action tolls the

running of the statute of limitations . . . [for] so long as the fraud is effective." Doc. 41 at

18 (quoting *Dos Santos v. Assurant, Inc.*, 625 F.Supp. 3d 121, 133 (S.D.N.Y. 2022)).  The

Court previously addressed this argument in the January 19 Opinion (*see* Doc. 33 at 15),

and Poulard still does not cite an authority for the proposition that such tolling is

available for the claims at issue here—which provide an entirely separate limitations

period that specifically anticipates delayed discovery due to fraud.  *See* Doc. .  The lone

case Poulard cites in support of this proposition, *Dos Santos*, addresses copyright

infringement under the Visual Artists Rights Act of 1990, 17 U.S.C.S. § 106A(a)(3)(B),

and contains no fraud claims.  Doc. 41 at 18.  Additionally, tolling based on fraudulent

concealment is only available where the plaintiff shows:  "(1) wrongful concealment by

[defendant], (2) which prevented [plaintiff's] discovery of the nature of the claim within

the limitations period, and (3) due diligence in pursuing the discovery of the claim."  *Dos

Santos*, 625 F.Supp. 3d at 133 (alteration in original) (citation omitted).  Poulard only

argues for equitable tolling based on Defendants' concealment of how they used

Poulard's investment.  Doc. 41 at 18.  However, as noted above, the face of the complaint

demonstrates that Poulard was not diligent in investigating how Defendants were using

his funds.  Accordingly, Poulard has failed to establish tolling based on fraudulent concealment.

Poulard makes no additional arguments that would otherwise toll the statute of limitations and, as all of the facts concerning the duty of inquiry "can be gleaned from the complaint and papers . . . integral to the complaint," dismissal is appropriate.  *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362 (2d Cir. 2013).

> 2. *Counts 4 (Breach of Contract), 5 (Breach of Fiduciary Duty), 6 (Misrepresentations and Omissions), 7 (Breach of the Duty of Good Faith and Fair Dealing), 8 (Conversion), and 9 (Unjust Enrichment) are Also Time-Barred*

Poulard argues that Defendants are equitably estopped from raising a statute of limitations defense with respect to counts 4–9 because "Defendants made continuous fraudulent misrepresentations to [Poulard] in order to conceal Defendants [sic] wrongdoing from [Poulard] over the course of several years, and that Defendants made repeated fraudulent promises to [Poulard] to return his investment . . . ."  Doc. 41 at 12–13.  However, "[e]quitable estoppel will not toll a limitations statute . . . where a plaintiff possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations."  *Koral*, 36 F.4th at 411 (alteration in original).  If a plaintiff was placed on inquiry notice and had the opportunity to timely investigate but failed to do so, equitable estoppel is not available to him.  *See id*.  The Court already held above that Poulard has not pled facts to show he was sufficiently diligent in investigating Defendants' wrongdoing once he was put on inquiry notice.  Therefore, for the reasons set forth above and in the January 19 Opinion, he cannot invoke the protections of equitable estoppel.  *See Koral*, 36 F.4th at 411.  His claims are therefore untimely, and the Court will grant Defendants' motion to dismiss.

### B.  Counts 1, 2, 3, 4, 8, and 9 Also Fail to State a Claim Upon Which Relief Can Be Granted

Defendants also argue that Poulard failed to plead Counts 1–3 (his fraud claims) with specificity, and Counts 4, 8 and 9 fail to state a claim upon which relief can be granted.

#### 1.  Counts 1 (Common Law Fraud), 2 (Fraudulent Inducement), and 3 (Fraudulent Concealment) Fail to Plead Fraud with Specificity

The Court previously held in its January 19 Opinion that Poulard failed to plead his fraud claims with particularity, as required by Rule 9(b).  Defendants seek to dismiss Poulard's fraud claims because they are materially identical to Counts 1–3 in the FAC and therefore continue to fail the heightened pleading standard for fraud required by Rule 9(b).  Doc. 40 at 9.  Poulard responds that the SAC sufficiently pleads the requisite elements of his three fraud claims.  Doc. 41 at 9.  Specifically, he argues that his complaint "has identified Mr. Delphin as the speaker who made misrepresentations to him . . . both prior . . . and subsequent to [Poulard's] execution of the Subscription Agreement and investment in order to conceal Defendants' fraud from Plaintiff" and that the statements were made "on a telephone call in January of 2015" as well as "in emails from Mr. Delphin."  Doc. 41 at 9 (citing Doc. 34 ¶¶ 24–29, 37–38, 58–70, 73–74, 78, 92–94, 98–100, 106–110).

The Court agrees with Defendants that the majority of Poulard's amendments are substantively identical to the FAC.  Paragraphs 24–29, 38, 73–74, 78, 92–94, 99–100, and 107–108 are identical to their counterparts in the FAC.  Paragraph 37 merely quotes the Agreement, which was previously included with the FAC.  Paragraphs 58–68 merely discuss the emails that were previously appended to the FAC.  Paragraphs 69–70 discuss a new May 28, 2021 email from Poulard and June 1, 2021 reply from Defendants, but they contain no information that is substantively different from earlier emails that were already included with the FAC.  Paragraphs 98 and 106 were amended, but only to include a fact that was already alleged in ¶¶ 23–25.

Only Paragraphs 109 and 110 include new allegations. In these paragraphs, Poulard states that Defendants intended to defraud Poulard, as well as deter Poulard from pursuing litigation or other options to resell his investments. Doc. 34 ¶¶ 109–10. Poulard further characterizes the emails as representations that Defendants "intended to and were working to arrange for the return of Plaintiff's investments." *Id* ¶ 109. None of these additions are useful in resolving a motion under Rule 9(b). *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("[The Second Circuit] has read Rule 9(b) to require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (internal quotation marks and citation omitted)). Therefore, for the reasons stated in the January 19 Opinion, Poulard has failed to plead his fraud claims with particularity and they may be dismissed on this basis as well.

### 2. *Count 4 Fails to State a Claim for Breach of Contract*

Count 4 alleges that Defendants breached the Agreement by (1) "failing to use [Poulard's] investment [. . .] to purchase equities as required under the subscription agreement and Mr. Delphin's oral representations to [Poulard,]" (2) negligently performing duties of supervision and due care with respect to [Poulard's] investment[,]" (3) "breaching the fiduciary duty owed to [Poulard,]" and (4) "knowingly violating state and federal securities laws." Doc. 34 ¶ 116. In opposition, Poulard also cites Defendants June 23, 2023 motion to dismiss, where Defendants allegedly admitted that the Agreement provided that Poulard's funds would be invested in equities. Doc. 41 at 13; *see* Doc. 28 at 10, n. 7. Defendants argue that the SAC merely recites portions of the Agreement (*see* Doc. 34 ¶¶ 35–36) and does not allege any new relevant facts, so its amendments are substantively irrelevant. Doc. 43 at 6. The Court agrees. Poulard's breach of contract claim is still insufficiently pled for two of the three reasons detailed in the January 19 Opinion. First, Poulard only alleges how the improper use of his equities breached a contractual clause of the Agreement. *See* Doc. 34 ¶ 116. He still fails to link

the other two breaches to contractual clauses. *See id.* Second, although Poulard cites the Agreement to justify the first alleged breach, the Court already considered the document itself in the January 19 Opinion. *See id.*; *see* Doc. 33 at 17–18. As previously determined, the Agreement, by its terms, does not *require* that his investment be used to purchase equities. *See id.*; *see* Doc. 34-2. Thus, Poulard has not sufficiently stated a claim for breach of contract.

       *3. Counts 8 (Conversion) and 9 (Unjust Enrichment) Fail to State a Claim*

       Defendants further seek to dismiss Counts 8 and 9 for the same reasons that they were dismissed in the January 19 Opinion, namely because the SAC counts are materially identical to their FAC counterparts. Doc. 40 at 12. The Court agrees with Defendants. The SAC contains no amendments that cure the defects the Court identified in the January 19 Opinion. *See* Doc. 33 at 18–19. As to Count 8, Poulard has still not cited any authority that substantiates his argument that Defendant's misappropriation is sufficient to state a claim for conversion. *Compare* Doc. 29 at 21–22 and Doc. 41 at 15–16. Therefore, the Court dismisses Counts 8 for the same reasons set forth in the January 19 Opinion. *See* Doc. 33 at 18–19.

       As to Count 9, Poulard argues that unjust enrichment may be pled in the alternative to breach of contract claims. Doc. 41 at 16. However, as previously held in the January 19 Opinion, "the existence of a valid and binding contract preclude[s] a claim for unjust enrichment," and courts "in this District have previously dismissed unjust enrichment claims that were indistinguishable from contract claims pleaded in the alternative in the same complaint, at least where the parties did not dispute that they shared a contractual relationship." *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, No. 21-cv-859 (NRB), 2022 U.S. Dist. LEXIS 32975, at *9 (S.D.N.Y. Feb. 23, 2022) (internal quotation marks and citations omitted). Here, there is no dispute that the parties were in a contractual relationship, and Poulard does not argue for a different standard. Therefore,

the Court dismisses Counts 9 for the same reasons set forth in the January 19 Opinion. *See* Doc. 33 at 18–19.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Poulard's Second Amended Complaint is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 39 and 40, and close the case.

It is SO ORDERED.

Dated:    October 16, 2024
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.